OPINION
NIEMEYER, Circuit Judge:
After completing a traffic stop of Victor Mason on Interstate 20, between Atlanta and South Carolina, with the issuance of a warning ticket, the Georgia state trooper making the stop extended it for several minutes, based on the trooper’s suspicion of criminal activity, to allow a drug-detection dog to sniff Mason’s vehicle. The dog alerted multiple times to the presence of a narcotics odor and then jumped into the car through an open window and sat on the back seat of Mason’s vehicle, again alerting to the presence of a narcotics odor. A search of the vehicle thereafter uncovered approximately 10 kilograms of cocaine, for which Mason was convicted of conspiracy to violate 21 U.S.C. § 841(a) and sentenced to a mandatory term of life imprisonment, under 21 U.S.C. § 841(b)(1)(A).
Mason’s appeal challenges the constitutionality of the search on the ground that the trooper impermissibly extended the traffic stop to obtain probable cause to search the vehicle, as well as the enhancement of his sentence by reliance on two allegedly invalid previous drug-trafficking *126 convictions. For the reasons that follow, we affirm.
I
At approximately 11:40 a.m. on August 12, 2005, Georgia State Patrol Trooper Blake Swicord observed Mason driving eastbound on Interstate 20 in Morgan County, Georgia, in a vehicle that had, in Trooper Swicord’s opinion, excessively tinted windows. Swicord activated his patrol car’s blue lights to pull Mason over, which automatically activated audio and video recording equipment, capturing the traffic stop on tape.
Trooper Swicord testified that after he turned on his blue lights, it took Mason “a while to pull over,” which “was not normal,” and that he observed Mason having a conversation with his passenger, which “raised [his] suspicion.” After Mason pulled over and lowered his window, Trooper Swicord noticed, as he approached the vehicle, that Mason was nervous and sweating. He also immediately smelled an “extreme odor” of air freshener coming from the vehicle. Officer Swicord testified at the suppression hearing that the odor was “absolutely abnormal” and strong enough to give an occupant of the ear a headache. Swicord also observed that there was only one key on the key ring and that there was no luggage in the interior of the vehicle. He saw on the back seat the newspaper for that day (recognizing Tiger Woods’ picture) with a label on it that said “Radisson Hotel.” Swicord testified that these factors led him to believe that Mason and his passenger, Nathaniel Govan, were on a “turn-around” trip to Atlanta, a known source city for drugs. Swicord also testified that Inter state 20 was common route for drug traffickers.
After Mason provided his driver’s license and the vehicle’s registration, Trooper Swicord asked him to step out of the vehicle. When he asked Mason who owned the car, Mason replied that his daughter did. Swicord then asked Mason his daughter’s name and the name of his passenger, as well as the purpose for their journey. Mason told Swicord that he had driven to Atlanta to see his uncle about getting a deed. Swicord then walked to the passenger-side window and asked Go-van, who had remained in the vehicle, the reason for their trip. Govan told a different story, stating that they had driven to see a friend, giving two different names. Swicord’s questioning of Mason lasted just over two minutes (11:41:20 a.m. to 11:43:34 a.m.) and his questioning of Govan lasted just over one minute (11:43:40 a.m. to 11:44:50 a.m.). Because the two stories conflicted and the newspaper indicated that Mason and Govan had stayed in a motel, Trooper Swicord concluded that both were “lying about their itinerary and were involved in criminal activity.”
Trooper Swicord returned to his patrol car, where he radioed Sergeant Michael Kitchens, a member of the K-9 unit, requesting that Kitchens come to the scene with a drug-detection dog. He then exited to test the tint of the windows of Mason’s vehicle and determined that they were in fact illegally tinted. Swicord returned to the patrol car to write a warning ticket regarding the illegal tint and to relay to his dispatcher Mason’s and Govan’s names, as well as insurance and registration information. This practice was routinely followed as a part of a traffic stop to verify information about the vehicle and to check for any outstanding warrants.
Swicord again exited his patrol car and handed the warning ticket to Mason regarding the illegal tint. This occurred at 11:50:45 a.m., less than 11 minutes after Swicord fust activated his blue lights. At this point, Swicord had finished all the *127 steps necessary to complete the traffic stop.
Trooper Swicord then asked Mason for consent to search his vehicle, and Mason refused. Swicord informed Mason that he believed that there were drugs in the car and that he was going to have a dog sniff the car to determine whether drugs were inside. Swicord ordered Govan out of the car, by which point in time Sergeant Kitchens had arrived. Sergeant Kitchens took his drug-detection dog on a leash around the outside of Mason’s vehicle, and on the first lap around the vehicle (at 11:55:02 a.m.), the dog alerted at both the passenger-side and driver-side doors. On a second lap around the vehicle, the dog jumped into the vehicle through the open driver-side window and gave a positive indication of the presence of drugs by pointing her nose next to the speaker in the back seat and sitting down on the seat.
After Sergeant Kitchens coaxed the dog out of the car, Trooper Swicord searched the vehicle. In the trunk, he found approximately 10 kilograms of cocaine powder in a black gym bag.
Following Mason’s indictment for conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1),* Mason filed a motion to suppress the evidence found in the vehicle, contending that his Fourth Amendment rights were violated because (1) Trooper Swicord lacked reasonable suspicion to detain him beyond completion of the traffic stop and (2) the dog’s entry into his vehicle was not supported by probable cause.
The district court denied Mason’s motion to suppress after a suppression hearing, at which Trooper Swicord and Sergeant Kitchens testified. The court found that Swicord had reasonable suspicion of drug activity when he had finished processing the warning ticket for the tint violation, justifying his extending the traffic stop. The court also found that the dog alerted to drugs on the outside of the car before jumping into the vehicle on its own, without any command from the officers. The court ruled that the dog’s positive indication by entry into the car provided probable cause to justify the search. The court also ruled that when an officer handling a dog does not prompt the dog’s entrance into the vehicle, the dog’s entrance in response to the “plain smell” of narcotics does not violate the Fourth Amendment.
Following Mason’s conviction by a jury, the district court sentenced him to a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A), based on the verdict finding him guilty of trafficking in five kilograms or more of cocaine and on his prior felony drug convictions. To satisfy the statutory requirement of at least two prior convictions, the government relied on (1) a conviction in the U.S. District Court for the District of South Carolina on January 25, 1993, for possession of cocaine base with intent to distribute it; (2) a conviction in a Richland County, South Carolina court on February 9, 1988, for possession of cocaine with intent to distribute it; and (3) a conviction in an Orangeburg, South Carolina court on July 22, 1988, for possession of cocaine with intent to distribute it. Mason objected to the use of the two prior state convictions, contending that he did not have an attorney when he pleaded guilty to those charges, and he submitted documents purportedly demonstrating his lack of representation. At the sentencing *128 hearing, the district court found that the documentation did not demonstrate that Mason’s prior convictions were uneounseled. Rather, the court found that the evidence indicated beyond a reasonable doubt that on both occasions Mason had the assistance of counsel. Accordingly, the court imposed the mandatory life sentence under § 841(b)(1)(A).
From the court’s judgment, Mason filed this appeal, challenging the denial of his suppression motion and the enhancement of his sentence.
II
Mason contends principally that the district court erred in denying his motion to suppress. He argues (1) that “the police lacked reasonable articulable suspicion to detain him beyond the time necessary to issue him a warning for his window tint,” and (2) that even if his continued detention was lawful due to reasonable suspicion, his Fourth Amendment rights were violated when the dog entered the car, either because Sergeant Kitchens opened the door to let the dog in or because probable cause to justify the entry was lacking.
With respect to Mason’s contention that reasonable suspicion was lacking to detain him after he was issued a warning ticket for the illegal tint, the government acknowledges that the traffic stop was completed when Trooper Swicord issued the warning ticket, at approximately 11:51 a.m., having taken some 11 minutes after Mason was pulled over. Mason’s continued detention therefore required Trooper Swicord to have had a reasonable suspicion of criminal activity. See Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); United States v. Foreman, 369 F.3d 776, 781 (4th Cir.2004).
Since Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a “reasonable suspicion” of criminal activity has justified an officer’s brief stop or detention of the suspect sufficient to permit the officer to allay the suspicion. “Reasonable suspicion” is demonstrated when an officer “point[s] to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity.” United States v. Branch, 537 F.3d 328, 336 (4th Cir.2008) (internal quotation marks and citations omitted). We have recognized that this standard “is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life.” Foreman, 369 F.3d at 781. For that reason, in assessing reasonable suspicion, courts must “consider the totality of the circumstances” and “give due weight to common sense judgments reached by officers in light of their experience and training.” United States v. Perkins, 363 F.3d 317, 321 (4th Cir.2004); see also Branch, 537 F.3d at 336-37 (noting that courts may “credit the practical experience of officers who observe on a daily basis what transpires on the street” (internal quotation marks and citation omitted)).
In this case, we readily conclude that when Trooper Swicord completed the traffic stop, his suspicion that Mason and Govan were engaged in criminal activity was indeed reason able, thereby justifying their additional detention. He articulated facts, when taken as a whole, supported his suspicion, even though several of the facts, when taken alone, were also consistent with innocent travel. First, Trooper Swicord stated that when he turned on his blue lights to pull Mason over, Mason did not pull over promptly, delaying his move *129 in an abnormal manner, and that Mason at the same time engaged in a conversation with the passenger. Even though a conversation between the driver and his passenger could have been expected, Swicord suspected that because the conversation was combined with the abnormal delay, Mason and Govan could have been deliberating on whether to comply with the blue lights or to flee. Second, when Swicord approached the vehicle and Mason rolled down the window, Swicord was immediately struck by an “extreme” odor of air fresheners beyond what he had normally experienced from the ordinary use of such fresheners. See Branch, 537 F.3d at 338 (noting that the “presence of several air fresheners — ‘commonly used to mask the smell of narcotics’ ” — is one factor contributing to reasonable suspicion (quoting Foreman, 369 F.3d at 785)). Third, Swicord observed that there was only a single key on Mason’s key ring. He concluded that this fact, combined with the fact that the two men were coming from the direction of Atlanta, a city that, according to him, was ranked third in the nation in terms of drug distribution, on a known drug route, could indicate that the men might have been on a “turnaround” trip as drug couriers. See Foreman, 369 F.3d at 785 (noting that the fact that the driver was coming from a known “source city” is a relevant factor supporting reasonable suspicion, particularly when other factors indicate that the stay in the source city had been brief). Fourth, Swicord noted that Mason was sweating and unusually nervous when interacting with him, and Mason’s nervousness did not subside, as occurs normally, but became more pronounced as the stop continued. See Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (“[Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion”). Fifth, and finally, when Mason and Govan were asked separately about the purpose of their travel, the two men gave conflicting answers, indicating that they were covering up the place where they had stayed and the real purpose of their travel. In addition, a current newspaper on the back seat indicated to Swicord that Mason and Gorman had actually stayed at a motel, further contradicting their stories.
We recognize that several of these facts could hardly have distinguished suspicious activity from innocent travel. But when all the articulated facts are taken as a whole, especially when they include the fact of Mason and Govan’s conflicting stories about the place where they stayed and the purpose of their travel, sufficient facts existed to have given an experienced officer a reasonable suspicion that criminal activity was afoot.
Mason’s argument focuses on the factors individually, claiming that each was subject to an innocent explanation and therefore could not have served to justify his continued detention. He explains, for instance, that he had only a single key because he had borrowed the car from his daughter and that he was sweating because it was a hot day. But just as one corner of a picture might not reveal the picture’s subject or nature, each component that contributes to reasonable suspicion might not alone give rise to reasonable suspicion. Indeed, it is often noted that the existence of reasonable suspicion is a case-specific inquiry, based on the totality of the circumstances. Thus, each factor contributing to a reasonable suspicion might be “consistent with innocent travel” but “when taken together, [might] give rise to reasonable suspicion.” Foreman, 369 F.3d at 781 (emphasis omitted) (citing United States v. Sokolow, 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)); see also Branch, 537 F.3d at 336 (“[C]ontext matters: actions that may appear innocuous at *130 a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances”). Such is precisely the case here, with all of the factors coming together at a single place and point in time to create a suspicion that each individual factor might not have created.
At bottom, we conclude that the objective facts facing Trooper Swicord created a reasonable suspicion of criminal activity and that he was therefore justified, under Terry and its progeny, in extending the stop for the brief period necessary to allay that suspicion.
Mason argues additionally that suspicion is not probable cause and therefore that Sergeant Kitchens’ dog was not constitutionally justified in “enter[ing] the [vehicle] before alerting to the presence of drugs [when] no warrant or exception to the warrant requirement existed.” He also disputes the district court’s factual finding that the dog entered the vehicle of its own accord. Instead, Mason maintains that the dog’s handler, Sergeant Kitchens, facilitated the dog’s entry by slightly opening the door or by holding the dog on a loose leash, “allowing] the [dog] to go where the officers themselves [could] not go and conduct what would otherwise be an unlawful search.”
Mason’s argument, however, fails to account for the dog’s conduct before it entered the vehicle. The district court found as fact that the dog alerted several times on the exterior of the vehicle before jumping through the window into the back seat. This finding was supported by testimony at the suppression hearing as well as by the video tape, where the dog can be seen placing her paws on the passenger-side window and moving her head rapidly, consistent with Sergeant Kitchens’ description of an alert. These alerts indicated that the dog perceived a narcotics odor while outside the car, thereby creating probable cause to believe that narcotics were present even prior to the dog’s entry into the vehicle. See Branch, 537 F.3d at 340 n. 2 (noting that a “positive alert” from a drug-detection dog provides probable cause to search the vehicle (citing United States v. Eura, 440 F.3d 625, 630 (4th Cir.2006), and United States v. Jeffus, 22 F.3d 554, 557 (4th Cir.1994)).
While we therefore need not address Mason’s argument that Sergeant Kitchens opened the door or prompted the dog to enter Mason’s car, that factual challenge would also fail. The district court found as fact that the dog jumped in the open driver-side window of her own accord and was not commanded by her handler to do so. This finding was supported by testimony at the suppression hearing, as well as by the videotape, and therefore was not clearly erroneous.
Ill
While Mason’s brief on appeal challenges the reasonableness of Mason’s detention only after Trooper Swicord issued the warning ticket, when Mason’s counsel and the government were questioned by the court at oral argument about whether Trooper Swieord’s questioning of Mason and Govan during the traffic stop about matters unrelated to the reason for the traffic stop amounted to an unconstitutional delay or extension of the traffic stop, Mason’s counsel argued that it did. Because of how and when the issue arose, there might be good reason to doubt whether Mason preserved the issue for appeal, but we need not decide that question because, we conclude, the argument has no merit.
The facts relevant to this argument are not disputed. Once Mason stepped to the rear of the vehicle during the course of the *131 traffic stop, Trooper Swicord questioned him for less than two and one-half minutes (11:41:20 a.m. to 11:43:34 a.m.), asking him relevant questions as to who owned the car and, when Mason replied that his daughter owned it, what his daughter’s name was. Swicord also asked Mason about where he had been, his destination, and the purpose of his trip. After concluding this questioning of Mason, Trooper Swicord walked over to Govan and questioned him for just over one minute (11:43:40 a.m. to 11:44:50 a.m.), during which time Govan gave a contradicting account of the purpose of their trip. Trooper Swicord then returned to his patrol car, radioed in information in accordance with traffic-stop protocol, and wrote out the warning ticket. From the time that Trooper Swicord began questioning Mason until the time that he finished questioning Govan, a total of three and one-half minutes had elapsed, and most of that time was devoted to questions directly relevant to conducting the traffic stop. Perhaps only one to one and one-half minutes involved questioning on matters unrelated to the traffic stop.
There is no support in Fourth Amendment jurisprudence for the notion that questioning unrelated to the purpose of a traffic stop requires reasonable suspicion, provided that the questioning occurs within the timeframe reasonably necessary to effectuate the traffic stop. An officer’s questions or actions during the course of a traffic stop or any other legal detention need not be solely and exclusively focused on the purpose of that detention. In Arizona v. Johnson, — U.S. -, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009), a unanimous Supreme Court noted just that:
A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop.... An officer’s inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.
(Emphasis added) (citing Muehler v. Mena, 544 U.S. 93, 100-01, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005)). Similarly in Mena, officers questioned a woman about her immigration status while she was handcuffed for safety purposes during the execution of a search warrant. She claimed that the questioning was not necessary for the officers’ safety and was therefore unconstitutional. Once again, a unanimous Supreme Court agreed that the questioning did not violate the Fourth Amendment even though it was wholly unrelated to the justification for her detention. See Mena, 544 U.S. at 100-01, 125 S.Ct. 1465; id. at 105, 125 S.Ct. 1465 (Stevens, J., concurring in the judgment).
Thus, when an individual is lawfully stopped for a suspected traffic violation, the officer may briefly ask questions unrelated to the stop. For instance, questions about the weather or simply “How ’bout them Georgia Bulldogs?” do not implicate the Fourth Amendment, provided that the unrelated questioning does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention. An officer’s incidental questions about a motorist’s destination and purpose of travel are no different. It has never been held that brief, incidental questioning about matters unrelated to the traffic violation violates the Constitution. See, e.g., United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir.2007) (“[A]n officer does not violate the Fourth Amendment by asking a few questions about matters unrelated to the traffic violation, even *132 if this conversation briefly extends the length of the detention” (citing United States v. Alcaraz-Arellano, 441 F.3d 1252, 1259 (10th Cir.2006); United States v. Burton, 334 F.3d 514, 518-19 (6th Cir. 2003); United States v. Childs, 277 F.3d 947, 951-54 (7th Cir.2002) (en banc))); see also United States v. Hamson, 606 F.3d 42, 44-45 (2d Cir.2010) (finding no Fourth Amendment violation due to unrelated, separate lines of questioning of a driver and a passenger regarding the purposes of their journey, point of origin, and destination); United States v. Everett, 601 F.3d 484, 492-94 (6th Cir.2010) (relying on Mena and Johnson in holding that brief questioning unrelated to the purpose of a traffic stop does not violate the Fourth Amendment).
The fact that Trooper Swicord directed one minute of his questioning to the passenger does not alter the calculus. See United States v. Soriano-Jarquin, 492 F.3d 495, 499-501 (4th Cir.2007). In Sonano-Jarquin, we held that there was no Fourth Amendment violation when an officer asked a passenger for identification, which ultimately led to reasonable suspicion of immigration violations, because the request did not prolong the stop, which was for a broken headlight. We noted, “We believe a simple request for identification from passengers falls within the purview of a lawful traffic stop and does not constitute a separate Fourth Amendment event. Assuming a lawful stop, an officer is entitled to some chance to gain his bearings and to acquire a fair understanding of the surrounding scene.” Id. at 500.
Of course, a traffic stop may not be extended beyond the time reasonably necessary to effectuate the stop, absent reasonable suspicion justifying further detention as a Teny stop. See Illinois v. Caballes, 543 U.S. 405, 407-08, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). In this case, Trooper Swicord went about his business promptly and with efficiency. He completed the entire traffic stop — including the brief questioning, the examination of papers, the calling of his dispatcher to relate information, the testing of the tinted windows, and the issuance of a warning ticket — within a period of less than 11 minutes. The one to two of the 11 minutes devoted to questioning on matters not directly related to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern. See United States v. Farrior, 535 F.3d 210, 220 (4th Cir.2008) (holding that de minimis delays in conducting a traffic stop do not violate the Fourth Amendment); United States v. Alexander, 448 F.3d 1014, 1017 (8th Cir. 2006) (“ ‘[A] two minute delay ... is a de minimis intrusion on the driver’s personal liberty that does not violate the Fourth Amendment’ ” (quoting United States v. Martin, 411 F.3d 998, 1002 (8th Cir. 2005)); United States v. Purcell, 236 F.3d 1274, 1279 (11th Cir.2001) (three-minute delay was de minimis and did not violate the Fourth Amendment). And, it cannot be said that the overall length of the 11-minute traffic stop involved an unconstitutional delay. Indeed, on numerous occasions, we have approved longer stops against challenges of unreasonable delay, as have other courts. See, e.g., United States v. Jeffus, 22 F.3d 554, 557 (4th Cir.1994) (approving 15-minute traffic stop); United States v. Mincey, 321 Fed. Appx. 233, 240-42 (4th Cir.2008) (35 minutes); United States v. Jones, 289 Fed. Appx. 593, 598-600 (4th Cir.2008) (20 minutes); United States v. Ramirez, 29 Fed. Appx. 111, 113-14 (4th Cir.2002) (15 minutes); Purcell, 236 F.3d at 1279 (14 minutes); Olivera-Mendez, 484 F.3d at 508, 510 (15 minutes).
In sum, the questions posed by Trooper Swicord during the traffic stop that were *133 unrelated to the basis for the stop did nothing to diminish the stop’s constitutionality, given that they caused only a brief delay.
IV
Mason also contends that two separate state drug felony convictions from 1988 were improperly used to enhance his sentence under 21 U.S.C. § 841(b)(1)(A) because he was not represented by counsel in those cases. In support of this contention, he submitted documents from those cases purportedly demonstrating his lack of legal representation, and he undertook to testify on this point at the sentencing hearing. In his testimony, Mason stated that he had been shot in the head in 2001, some 13 years after those convictions, leaving him with little or no memory of the events prior to 2001, including events at the time of his state convictions. He stated that he had no memory of being represented by an attorney for either state charge or being advised of his right to counsel. He also testified that he had no recollection of his prior federal conviction in 1993 or of having served 70 months in prison for that conviction.
The district court concluded that Mason did not carry his burden of demonstrating by a preponderance of the evidence that his prior state convictions were uncounseled. See 21 U.S.C. § 851(c)(2). None of the documents he offered supported his contention, and his testimony indicated that he was unable to recall events before 2001. Indeed, based on the evidence, the district court concluded that the record showed affirmatively that Mason was in fact represented during both of those convictions.
Regarding the first, a February 1988 conviction for drug trafficking in Richland County, South Carolina, the charging document submitted by Mason had “Def Screen” written on it, which indicated to the court that Mason had been represented by local defense attorney Jerry Screen. A ledger from Screen’s office confirmed that in August 1987, Mason retained Screen to represent him on a charge for cocaine distribution, and this date coincided with the date of Mason’s August 1987 arrest for the conduct underlying the February 1988 conviction. Furthermore, this same conviction was used to calculate Mason’s sentence for his federal conviction in 1993, without objection from Mason.
Regarding the second state conviction, which occurred in Orangeburg, South Carolina, in July 1988, a form submitted by Mason indicated that he was represented by attorney Charles H. Williams. The indictment reflected this fact as well. And again, consistent with this evidence, the 1993 presentence report for Mason’s previous federal charge indicated that Mason was represented during this state conviction, again without objection by Mason.
In short, Mason has failed to carry his burden of demonstrating that the prior convictions were uncounseled.
Moreover, we note that Mason’s challenge to the validity of his state convictions was in any event likely barred by the statute of limitations in 21 U.S.C. § 851(e), which provides, “No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction.” The two state convictions that Mason challenges occurred more than five years before the government submitted its § 851 information in this case.
V
Finally, Mason contends that the fact of his prior convictions needed to be *134 proved to a jury beyond a reasonable doubt. Because that fact was not found by a jury beyond a reasonable doubt, he asserts, the use of the prior convictions to enhance his sentence violated his Sixth Amendment rights. Mason candidly acknowledges that this argument is presented for purposes of preserving the issue for the Supreme Court and that, under the present jurisprudence of Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), such an argument cannot be sustained. We agree. Moreover, we note that since AlmendarezTorres, the Supreme Court has repeatedly affirmed the exception, as have we. See Shepard v. United States, 544 U.S. 13, 25-26 & n. 5, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005); Apprendi v. New Jersey, 530 U.S. 466, 488-90, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); United States v. Cheek, 415 F.3d 349, 354 (4th Cir.2005).
For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

 While Mason was stopped in Georgia, the indictment charged a conspiracy "in the District of South Carolina and elsewhere.”